IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LEROY M. LINCOLN, #320748          *
             Petitioner
             
     v.          *          CIVIL ACTION NO. DKC-08-2148

NANCY ROUSE, WARDEN and          *
THE ATTORNEY GENERAL OF THE
  STATE OF MARYLAND          *
            Respondents.
                ***

## **MEMORANDUM OPINION**

Pending before the court are Petitioner's original and amended writ of habeas corpus, Respondents' answer thereto, and Petitioner's Reply.  Paper Nos. 1, 11, 15, & 17.  After review of these papers, the court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. § 2254(e)((2).  For reasons that follow, the Petition will be denied and dismissed with prejudice.

## **Procedural History**

On November 18, 2002, an indictment was filed in the Circuit Court for Baltimore City charging Petitioner with first-and second-degree murder and conspiracy to commit first-degree murder of his father, Leroy Lincoln Sr.[1]  Paper No. 15 at Ex. 1.   On September 17, 2003, a motions hearing was held before Circuit Court Judge John Glynn to address a (1) motion to suppress statement as involuntary and (2) motion in limine dealing with the admissibility of conspiratorial statements offered by a co-defendant.   *Id*., Ex. 2.   The transcript of Petitioner's taped police statement, documents shown to Petitioner at his October 8, 2002 interrogation (including a photo array and written notations on same), and testimony of Police Detective Tyrone Francis and Petitioner as to the October  2002 interrogation were admitted into evidence.  Judge Glynn denied

---

[1]       The murder occurred in February of 1995.

the motion to suppress.[2]   Paper No. 15, Exs. 2 & 3.   Trial commenced on September 22, 2003.   At

the conclusion of the state's case on September 25, 2003, Petitioner's motion for judgment of

acquittal was denied by Judge Glynn.  *Id.*,  Ex. 7, Tr. at 3-7.   The defense rested its case without

calling any witnesses.

The facts adduced at trial, as described by the Court of Special Appeals of Maryland, were as

follows:

> On February 27, 1995, Leroy Lincoln Sr. was murdered in his home on East
> Northern Parkway in Baltimore City.   The cause of death was blunt force trauma to
> the head.
>
> Lincoln Sr. was the appellant's father.   The appellant was 18 years old when the
> murder took place.    Also at the time of the murder, Lincoln Sr. was married to
> Geralene Lincoln, the appellant's mother, although it is not clear from the record
> whether Lincoln Sr. and Geralene were living together.
>
> The murder case remained unsolved for several years until Baltimore City Police
> Detective Tyrone Francis, of the "Cold Case Unit," reopened the investigation. He
> tracked down Monique Peterson, who was the appellant's girlfriend at the time of the
> murder.   On August 23, 2003, Francis interviewed Peterson and obtained a tape-
> recorded statement from her.
>
> Peterson told Francis that, sometime before the murder, she heard Geralene say she
> wanted to kill Lincoln Sr.  Also, Peterson had a conversation with the appellant in
> which he said that he, his mother, and his friend "John," were planning to kill
> Lincoln Sr.  Peterson identified a picture of one John Ulrich as the friend in question.
> Peterson further stated that, after the murder, the appellant said his father was dead
> and that Ulrich had killed him.   The appellant told her that he and Ulrich had gone to
> Lincoln Sr.'s house and that Ulrich had hit Lincoln Sr. with the back of an ax handle.
>  The appellant also told Peterson the murder had been carried out so his mother could
> obtain his father's insurance money.

---

[2]        Judge Glynn concluded that during interrogation Detective Francis engaged in a series of
clever misrepresentations regarding false written entries made on the back of photographs shown to Petitioner
to "create a certain state of mind." Paper No. 15, Ex. 3, Tr. at 5.  He found that the Detective's actions were
part of an "acceptable ruse."  *Id.*, Ex. 3, Tr. at 6 & 9.  After listening to the taped statement, Judge Glynn
further concluded that Petitioner's statement was voluntary and that there was no violation under *Miranda v.
Arizona*, 384 U.S. 436 (1966).  *Id.*, Ex. 3, Tr. at 7-9.

Francis attempted to interview Ulrich.  Ulrich would not give a statement, but did remark, "If you did something with somebody, wouldn't you rather talk to them first before giving a statement?"

By the time the investigation was reopened, the appellant was 26 years old and was living in North Carolina.  His mother was living in North Carolina also.  They had moved there in late 1995.

As a result of Francis's investigation, the appellant and Geralene Lincoln were arrested in North Carolina, on October 3 and October 6, 2002, respectively.  Francis and Detective J. T. Brown also of the "Cold Case Unit," traveled to that state and, on October 8, 2002, obtained a tape-recorded statement from Geralene.  That afternoon, they interviewed the appellant at the Wilkes County Sheriff's Department in Wilkesboro.

Paper No. 15, Ex. 11 at pgs. 1-3.

After deliberation the jury found Petitioner not guilty of first- and second-degree murder and guilty of conspiracy to commit murder.  Paper No. 15, Ex. 7, Tr. at 90-93.  Judge Glynn sentenced Petitioner to life imprisonment, with all but 25 years suspended.  *Id.*, Ex. 8.  Petitioner filed a counseled appeal alleging that Judge Glynn erred in refusing to suppress his statement to the police.  *Id.*, Ex. 9.  The Court of Special Appeals of Maryland affirmed the conviction on September 14, 2005.  *Id.*, Ex. 11.  Petitioner filed a petition for writ of certiorari.[3]  *Id.*, Ex. 12.  On December 21, 2005, the Court of Appeals of Maryland denied certiorari without substantive comment.  *Id.*, Ex. 13.

In August of 2006, petitioner filed a petition for post-conviction relief in the Circuit Court for Baltimore City which, as later supplemented by post-conviction counsel, raised the following grounds: (1) ineffective assistance of trial counsel for failing to (a) impeach state witness Tia Whitehead with regard to her failure to remember a "planning meeting" between Petitioner,

---

[3]        On certiorari Petitioner claimed that: he was denied his request to speak with legal counsel during his interrogation; he was coerced into providing statements by the admitted use of fabricated documents used by detectives; the trial judge based his decision on "personal feelings and/or experience…;" and he was arrested in another state and held without due process until investigating detectives arrived to interrogate him.  Paper No. 15, Ex 12.

Geralene Lincoln, and John Ultrecht[4] and her lies to get the police to reopen the criminal case as set out in the State's Attorney's supplemental disclosure, (b) investigate the state's witnesses, in particular the criminal and arrest record of his ex-girlfriend Monique Peterson, for impeachment purposes as to her detention on the date of the murder, (c) impeach Tia Whitehead regarding her interest in sensationalizing the case given the publication of her non-fiction book on her life and the murder of Leroy Lincoln Sr. called "A Child of Baltimore;" and (d) prosecutorial abuse in presenting false testimony from Tia Whitehead. *Id.*, Exs. 14 & 15.  After a hearing before Circuit Court Judge Marcella A. Holland, post-conviction relief was denied on October 16, 2007.  *Id.*, Exs. 16 & 17.  On July 29, 2008, the Court of Special Appeals denied Petitioner's Application for Leave to Appeal.  *Id.*, Exs. 18 & 19.

In his original habeas corpus action, Petitioner asserts that:

A. Trial counsel was "defective;"[5]

B. His trial was prejudiced by trial counsel's withholding of "pertinent disclosures" from the jury that related to the credibility of the state's witnesses, including the state's "star" witness, his sister Tia Whitehead (nee Lincoln);[6]

C. The prosecutor knowingly allowed state witness Tia Whitehead to commit perjury; and

D. Statements gathered before trial should have been suppressed at hearing because they were coerced by police through the use of falsified exhibit photographs.[7]

---

[4]     This co-defendant is referred to as John Ulrich and John Ultrecht in court documents.  For purposes of identification, the court shall refer to this alleged conspirator as John Ultrecht.

[5]     Petitioner presents this ground in terms of post-conviction court error.  *See* Paper No. 1 at 6, § A & 6A at A.

[6]     This ground is couched in terms of post-conviction court error.  *See* Paper No. 1 at 6, § B & 6A at B.

[7]     This ground is couched in terms of appellate court error.  *See* Paper No. 1 at 6 & 6B at D.

Paper Nos. 1 & 11.

Petitioner subsequently amended his Petition to include the claim that state's witness Tia Whitehead's entire testimony was "extremely fabricated" and not supported by physical evidence as borne out by a document (letter) and testimony entered into the record on post-conviction review.[8] Paper No. 11.

## Threshold Considerations

### A.  Exhaustion of State Remedies

Prior to seek federal habeas relief, a petitioner is required to exhaust each claim presented to the federal court by pursuing remedies available in state court.  *See Rose v. Lundy*, 455 U.S. 509 (1982).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  *See* 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by proceeding with certain claims on direct appeal to the Court of Special Appeals (and thereafter seeking certiorari to the Court of Appeals) and with other claims by way of a post-conviction petition, followed by seeking leave to appeal from the Court of Special Appeals. Petitioner no longer has any direct or collateral review remedies available to him with respect to the claims raised in this court.  Accordingly, his claims will be considered exhausted.

### B. Statute of Limitations

There is no contention that the petition is time-barred pursuant to 28 U.S.C. § 2244(d).

---

[8]       This ground is also couched in terms of post-conviction court error.  *See* Paper No. 11. Indeed, with the exception of ground three, all grounds are presented in terms of attacking state post-conviction and appellate court decisions.

### C. Procedural Default

Before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court. *See Rose v. Lundy*, 455 U. S. 509, 521 (1982). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728 (1999); 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction proceedings. Exhaustion is not required if at the time a federal habeas corpus petition is filed the petitioner has no available state remedy. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U. S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).

The procedural default doctrine bars consideration of a claim in a petition for habeas corpus absent a showing of cause and prejudice or actual innocence. *See Murray*, 477 U.S. at 495; *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977). Even where a petitioner fails to show cause and prejudice for a procedural default a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U. S.298, 314 (1995); *Bostick v. Stevenson*,  --- F.3d ---, 2009 WL 4877312, at *2 (4th Cir. 2009). The miscarriage of justice standard is directly linked to innocence. *Schlup*, 513 U.S. at 320. Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional

claims which are defaulted. *Id*. at 315.  The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U. S. at 496.

Respondents claim that Petitioner's amended general claim regarding the admission of Tia Whitehead's "inconsistent" testimony is procedurally defaulted because it was not raised on direct appeal.   The court agrees.  While this claim was raised in terms of prosecutorial abuse, it was not presented in its current form in the state courts.   Petitioner was given an opportunity to file a reply explaining why his amended claim should not be procedurally defaulted.  Paper No. 16.    In his Reply he asks to withdraw this claim.    Paper No. 17 at 17.    The ground shall be considered abandoned.

## Analysis of Petitioner's Claims

### Standard of Review

Because the Petition was filed after April 24, 1996, it will be decided under amendments to the habeas corpus statutes contained in Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Brown v. Angelone*, 150 F.3d 370, 372 (4th Cir. 1998).   Under the AEDPA, federal courts conducting habeas corpus review no longer can correct mere error in state court proceedings, but must instead exercise a more limited review set forth in 28 U.S.C. § 2254(d)(1) and (2)(as amended). Section 2254(d) now provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), the Supreme Court characterized 28 U.S.C. § 2254(d) as a "new, highly deferential standard for evaluating state court rulings." In *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000), Justice O'Connor, speaking for the majority, further elucidated:

> Section 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under Section 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to...clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of...clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-413. Justice O'Connor indicated that "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'...refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Furthermore, she indicated that:

> [u]nder Section 2254(d)(1)'s 'unreasonable application clause...a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411.

In other words, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively

8

unreasonable." *Id*. at 410.  A state court decision involves an "unreasonable application" of Supreme Court precedent if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id*. at 407-08, or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000); *see also Booth v. Nuth*, 288 F.3d 571 (2002).[9]

The Court reaffirmed and applied these standards in an ineffective assistance of counsel context in *Bell v. Cone*, 535 U.S.685 (2002).   It explained:

> For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. See *Williams,* supra, at 411.  Rather, he must show [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id*. at 698-99.

"The federal habeas statute dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt. The required deference encompasses both the state court's legal conclusions and its factual findings." *Lenz v. Washington,* 444 F.3d 295, 299 (4th Cir. 2006) (internal quotation marks and citation omitted).  "The question ... is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan,* 127 S.Ct. 1933, 1939 (2007).  Consequently, where the state court has adjudicated a

---

[9]     A decision is contrary to the Supreme Court's clearly established precedents if the state court applied a rule that contradicts the governing law set forth in the Court's cases, or if it confronted a set of facts that is materially indistinguishable from a decision of the Court but reached a different result. *See Brown v. Payton*, 544 U.S. 133, 141 (2005). A decision constitutes an unreasonable application of the Court's clearly established precedents if the state court applied the Court's precedents to the facts in an objectively unreasonable manner. *Id*. In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. §2254(e)(1).

claim on the merits, federal habeas relief is appropriate only if the state court's judgment resulted in a decision that is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Green v. Johnson*, 515 F.3d 290, 299 (4th Cir. 2008).  A decision is contrary to the Supreme Court's clearly established precedents if the state court applied a rule that contradicts the governing law set forth in the Court's cases, or if it confronted a set of facts that is materially indistinguishable from a decision of the Court but reached a different result.  *See Brown v.* Payton, 544 U.S. 133, 141 (2005).  In reviewing Petitioner's attack on his state court conviction, the court presumes that factual determinations made by the state court are correct.  Petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  With these standards in mind, the court shall consider his remaining claims.

## A.  Ineffective Assistance of Trial Counsel

To establish a claim of ineffective assistance of trial counsel, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).  With regard to the first prong of this test, this court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690. All circumstances are to be considered, and this court's scrutiny of counsel's conduct must be "highly deferential." *Id*. at 688-89.

Under *Strickland*, a petitioner must also establish a second prong, that prejudice resulted from counsel's errors. To establish prejudice, he "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694; *see also Campbell v. Polk*, 447 F.3d 270, 279 (4th Cir. 2006).

Petitioner claims that trial counsel Roland Walker was ineffective for failing to impeach the state's witnesses, in particular his sister Tia Whitehead, with disclosures that went to witness credibility. He attaches state disclosures and police memoranda to show that, at pre-trial interviews and in conversations with authorities, Whitehead's testimony was inconsistent in that: she failed to remember if there was a "planning meeting" to plot her father's death; she admitted she lied to police about a new development in the case in order to "get the police to start investigating the case again;" and she was an anonymous caller to police who identified Petitioner as one of three subjects possibly involved in Leroy Lincoln Sr.'s death. In her post-conviction, opinion Judge Holland analyzed the claim under *Strickland* and made the following observations regarding the testimony of Monique Peterson, Tia Lincoln-Whitehead, and Tyrone Jackson:

> In the instant matter, the State brought forth three witnesses to bolster their case against the Petitioner at trial. While other witnesses were called, these three witnesses played a pivotal role in the Petitioner's prosecution for conspiracy to commit murder. The three witnesses testified collectively to several key evidentiary parts. They provided testimony regarding the Petitioner's possible motive, a confession and opportunity to further the conspiracy.
>
> The first of these witnesses was Monique Peterson. Monique Peterson was the ex-girlfriend of the Petitioner. She testified that the Petitioner arrived at her house hysterical and testified that he had in fact something to do with the murder of his father.
>
> > Monique Peterson: Well, he came in the house like all hysterical and, you know, hands all in his face like, oh, my God, oh, my God. And I was like what? What's up? What happened? He was like, yo, wait a minute. I just can't talk right now. I can't talk right now. I was like what? He was like, we did it. We did it. He was like we did it. I was like what? He was like, yo, my father is dead.

Tr. 9/22/03 pg. 165 ln. 14.

The second witness was Tia Lincoln-Whitehead.  Ms. Whitehead is the sister of
Petitioner.  Ms. Whitehead testified she overheard a planning meeting between her
mother, brother, and another man, concerning the potential murder of her father.  Ms.
Whitehead's testimony is evidence of the conspiracy to commit the murder of Leroy
Lincoln Sr.

Finally Tyrone Jackson is an associate of the Petitioner.  Mr. Jackson testified that
the Petitioner stated that he wanted to kill his father.  Furthermore, his testimony was
that the Petitioner also thought of several ways to kill his father.  His testimony
furthers the State's contention that there was a conspiracy to commit the murder.

These witnesses provide key components in the Petitioner's conviction.  In their
testimony, there is a confession, motive, and a broadening of the conspiracy.  Despite
the mounting evidence, defense counsel refused to impeach these witnesses on
several key factors.

As Petitioner notes in his Supplemental Brief, Ms. Tia Whitehead was writing a
novel concerning the outcome of the case and the events that led up to the trial.  The
Petitioner believed that the primary focus for penning the work was for profit.
However, defense counsel failed to confront Ms. Whitehead on the stand about the
novel.  Another witness, Ms. Monique Peterson is a former drug addict, whom at the
time of trial had a pending charge for prostitution.  Additionally, she testified that the
Petitioner came to her house on the night of the murder and told her that he had
killed his father.  Nonetheless, the Petitioner has produced evidence at the Post-
Conviction hearing that on the night of the murder that Ms. Peterson was
incarcerated and far away from Mr. Lincoln.  Finally, Mr. Jackson testified
concerning the Petitioner's desire to murder his father.  Mr. Jackson is a convicted
murderer who on the stand alluded to blaming the Petitioner for his arrest.  Despite
these concerns, these witnesses did not have their testimony challenged or impeached
on these matters.

These critical facts were absent from defense counsel's cross examination.  This
Court does not consider peripheral attacks on a witnesses' credibility to have any
effect [on] the outcome of the case. Schmit v. State, 140 Md. App. 1, 779 A.2d 1004
(2004).  This Court does believe that if defense counsel is negligent in impeaching a
crucial witness, such neglect could be considered deficient and ineffective assistance.

It is not so much that the trial counsel failed to attack the witnesses.  Defense
counsel's cross-examination did address several issues concerning the memory of the
witnesses in conjunction with some of their inconsistent statements.  It is more that
he failed to address these critical matters, which can be considered ineffective
assistance of counsel.  See Bowers v. State, 320 Md. 416, 425 (1990).  In order to
establish the first prong of deficiency, the petitioner must (1) identify the acts and/or

omissions that came from a lack of reasonable professional judgment; (2) show that counsel was not performing to the level guaranteed by the Sixth Amendment; and (3) overcome the presumption that any acts this Court holds that defense trial counsel did were defective and thus the first prong of the Strickland Test is satisfied.

Paper No. 15, Ex. 17 at 4-7.

Judge Holland noted, however, that *Strickland* contains a two-pronged test, "requiring an affirmation of both prongs in concluding ineffective assistance of counsel." *Id.*, Ex. 17 at 7. She moved on to the "prejudice" element of Strickland and concluded that Petitioner had failed to demonstrate that but for Roland Walker's deficient performance there was a reasonable probability that the outcome of the trial would have been different. Judge Holland observed that:

> In the instant matter, this Court must juxtapose the deficiency of counsel with the potential of said deficiencies to affect the outcome of trial. The Petitioner was charged and convicted of conspiracy to commit murder. At the Post-Conviction hearing, the Petitioner claimed to have drove to his father's house. He testified that the men began to smoke marijuana. Mr. Ulrecht then began to beat his father to death. At the Post-Conviction hearing, the Petitioner stated that once the first blow was struck, he blacked out, left the house, covered up his footprints in the snow and waited for Mr. Ulrecht in his car.

> Furthermore, the Petitioner gave a statement to the Baltimore City Police Department telling them the same story. This statement was entered into evidence as Exhibit 8 at trial. Conspiracy is defined as a combination by two or more persons to accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means. Quaglione v. State, 15 Md. App. 571 292 A.2d 785 (1972). The act of conspiracy does not take a formal agreement and may be completed without any overt act. Id. Furthermore, a "conspiracy may be shown by circumstantial evidence from which an inference may be drawn, and it is not necessary to demonstrate that the conspirator met and agreed to terms to a design and to pursue it by common means." Hill v. State, 231 Md. 458, 190 A.2d 795 (1963).

> In sum, the Court is not convinced by the trial court record or Petitioner's testimony at his Post-Conviction hearing that he had no knowledge of the conspiracy. There was no evidence presented at trial or the Post-Conviction hearing to corroborate the Petitioner's story that he blacked out and had nothing to do with the murder of his father. This Court believes that it can infer that the Petitioner was part of the common design and conspired with others to kill his father. Even if this Court were to strike the testimony of the three witnesses mentioned above (which would not be the normal outcome of impeachment), the Petitioner's confession in and of itself

provided enough evidence to prove that the Petitioner was involved in the conspiracy. Since the confession proves his part in the conspiracy, this Court holds that the Petitioner was not prejudiced by defense counsel's deficient performance.

Paper No. 15, Ex. 17 at 8-9.

After review of Petitioner's trial and post-conviction transcripts, the court finds that Judge Holland's determinations survive scrutiny under 28 U.S.C. § 2254(d).   While the court questions whether Petitioner has explicitly placed defense counsel's cross-examination of Tyrone Jackson at issue, the trial record shows that Jackson's conviction for murder was placed on the record and that Roland Walker did bring out issues concerning (1) Jackson's animosity towards Petitioner and his mother as affiants and potential witnesses who pointed out Jackson as the killer, resulting in Jackson's murder charges and subsequent conviction and (2) Jackson's false testimony that he was not angry at Petitioner for attracting police attention to him.   *See* Paper No. 15, Ex. 6 at 93-99, 101-103.  As noted by Respondent, Roland Walker was able to impeach Jackson by showing that he was a murderer, that he had reasons for testifying falsely against Petitioner, and that he had lied on the stand.  Indeed, when reviewing Jackson's cross-examination testimony, the court finds that Walker attempted to chip away at Jackson's character and credibility.

With regard to Judge Holland's finding of no prejudice under the second prong of *Strickland*, the court finds that the post-conviction court applied precedential caselaw to the facts of the criminal case in an objectively reasonable manner.  To the extent that Walker's performance was deficient in the cross-examination of witnesses (1) Jackson, in general,  (2) Monique Peterson,  as to whether she was incarcerated on the night of the murder and therefore could not have heard Petitioner's

14

confession,[10] and (3) Tia Whitehead, as to her alleged inconsistent statements and lies to police and pecuniary interest in publishing a book concerning the murder, the undersigned finds that Petitioner has failed to prove that the jury verdict would have been different but for such deficiencies.[11]   There was otherwise strong evidence of guilt presented to the jury, such as Petitioner's statement to police that he went with John Ultrecht to his father's apartment, smoked marijuana with Ulrecht and his father, witnessed Ulrecht beating his father with a "wooden stick," left the apartment and "smeared" his footprints in the snow so they were not identifiable, and sat in Ultrecht's car to wait for him. Paper No. 15, Ex. 6, Tr. at 143-48.  Simply put, Judge Holland correctly observed that that there was independent evidence of Petitioner's guilt to support the jury's finding with regard to conspiracy to commit first degree murder.   No prejudice has been demonstrated.[12]

---

[10]      The court observes that during trial, Roland Walker asked Baltimore City Police Detective Francis if he had checked to see if Peterson was in jail or juvenile homes at the time of the incidents and he indicated that he had done so.  Paper No. 15, Ex. 6, Tr. at 166.  Also, during her testimony, Peterson indicated that prior to the murder Petitioner had told her that "they were going to kill his father."  *Id*., Ex. 5, Tr. at 165. On cross-examination, defense counsel attempted to impeach Peterson by noting her numerous aliases, false birthdates, criminal history, and her history of drug abuse and being "high" during Petitioner's inculpatory conversations.  Counsel also tried to get Peterson to pinpoint the dates on which she allegedly heard Petitioner discuss his father's murder and the dates she was detained.  *Id*., Ex. 5, Tr. at 173-178, 182, 185-191. Defense counsel did get Peterson to state that Petitioner had indicated that John Ulrecht had beaten his father.  *Id*., Ex. 5, Tr. at 192,   Further, at the post-conviction hearing it was brought out that Peterson was confined at the Mountain Manor detention facility on the date of the murder, but had escaped the day after.   *Id*., Ex. 16, Tr. at 73.

[11]      The court has examined Whitehead's testimony and finds that it was not particularly helpful to the State's case.   She did not testify that she heard Petitioner state he was going to kill his father.   Instead, she did testify that Petitioner never said one word to indicate that he was for the idea of killing Leroy Lincoln Sr. Rather, Whitehead's testimony focused on Geralene Lincoln as the primary suspect who (1) suggested the murder during approximately 50 conversations over several years, (2) told Whitehead not to go over to her father's apartment the night of the murder, and (3) informed her that Petitioner did not know about the murder. Paper No. 15, Ex. 6, Tr. at 30-32, 41, 47, & 51.  Also, Lincoln testified that Petitioner had told her he had nothing to do with the murder. *Id*, Ex. 6, Tr. at 36.

[12]      Petitioner seemingly claims that his statement to police that he went to his father's home, witnessed John Ultrecht beat his father with a stick, and then left with Ultrecht, while true, was insufficient to convict him of conspiracy.  Paper No. 17 at 2.   The sufficiency of the evidence claim is not before the court.

### B.  Prosecutorial Misconduct

Petitioner argues that State's Attorney Sam Yee knew that Tia Whitehead had given perjured testimony based upon his supplemental disclosure that Whitehead had given inconsistent statements about "fully remembering" if there was a planning meeting to plot her father's death and had disclosed that she lied to the police about a new development in the case in order to get the police to reopen the investigation.   While this issue was raised on post-conviction review and commented on by Mr. See during the post-conviction hearing,[13] it does not appear that Judge Holland entered a ruling on this precise ground either under state or federal law.   The court shall conduct a *de novo* review of this claim.  *See Moss v. McKune*, 258 F.Supp.2d 1168, 1178 (D. Kan. 2003).

A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome at trial.  *See United States v. Bagley*, 473 U.S. 667, 678 (1985); *United States v. Agurs*, 427 U.S. 97, 103 (1976)).   A prosecutor who knowingly presents false evidence violates due process, regardless of whether the evidence is relevant to substantive issues or to witness credibility only. *See Napue v. Illinois,* 360 U.S. 264, 269 (1959). In order to establish a due process violation, Petitioner must show that (1) Whitehead's testimony was in fact false, (2) the prosecution knew it to be false,

and (3) the testimony was material.   *Id*., at 269-71; *see also Jackson v. Brown*, 513 F. 3d 1057, 1071-72 (9th Cir. 2008).

---

[13]          *See* Paper No. 17, Tr. at 77.

A careful review of Whitehead's testimony on direct and cross-examination shows that she never testified as to a "planning meeting"[14] and State's Attorney's Yee's statements in his supplemental disclosure (Paper No. 1 at Exhibit 1) regarding inconsistencies in her prior statements regarding remembering a "planning meeting," is insufficient to establish he knowingly allowed Whitehead to perjure herself on the witness stand.   Further, Whitehead never testified as to contacting police regarding there being a new development in the case.  The court therefore finds no indicia of perjury to support the prosecutorial abuse claim.

## C.  Suppression of Evidence

Petitioner asserts that Detective Francis's use of fabricated written entries on the back of the photo array presented to him during his interrogation constituted an impermissible form of deception and his confession should have been suppressed.  This issue was raised on direct appeal and rejected by the Court of Special Appeals.  Paper No. 15, Ex. 11.   After conducting an extensive review of caselaw and the suppression hearing, the court made the following statements:

> We now return to the facts in this case at bar, as credited by the hearing court, to assess whether, given the total circumstances surrounding the appellant's interrogation and statements, including that the police showed him fabricated witness statements to misrepresent the evidence against him to trick him into confessing, the appellant's statements were made voluntarily.

> The photographs presented to the appellant were genuine, but the handwritten statements on their reverse sides were fabricated.  The statements ostensibly were written by the witnesses (Peterson and Ulrich) and were meant to look as such.  The fabrications thus were of handwritten statements, not of official, scientific, or government documents.  They did not create an appearance of authority and reliability as would, for example, DNA tests presented on the stationery of a police crime laboratory.  As mentioned above, the statement designed to look like it had

---

[14]      Petitioner claims that while Whitehead never testified about a "planning meeting," she was asked a series of questions by Mr. Yee regarding walking into Petitioner's mother's home and seeing Petitioner, John Ulrich, and his mother gathered about a table looking at a newspaper clipping about a woman who had tried to kill her husband and had been caught.   Paper No. 17 at 5-7 & 14-15.

been written by Ulrich was an amateurish fakery (which prompted the hearing judge to ask Francis whether the writing really was his, after Francis had said it was). The "unsigned" statement on the reverse of the photograph of Geralene was in the same handwriting. The appellant claimed not to have been shown that photograph or statement at all.

The information imparted in the fabricated "statements" was for the most part true, in that it represented information learned by the police in the course of their "Cold Case Unit" investigation. The information on the back of the photograph of Ulrich, for example, was information the police had learned by interviewing Peterson. Although Ulrich had not confessed to killing Lincoln, Sr., Peterson had told the police that the appellant had told her that Ulrich had done so. The ruse was to inflate the strength of the evidence by making the appellant think not only that Peterson had implicated him and Ulrich, but also that she had committed her accusation to writing; and that Ulrich had turned on him and Geralene and also had committed his account to writing. While underhanded, we cannot say that this trick would have dominated the appellant's will so he could no longer freely decide what to say.

Significantly, as in *Whittington*, the appellant did not immediately confess after being presented with the officer's ruse. The appellant continued to deny knowledge of the murder after Francis showed him the photographs and statements. Indeed, he did not display any change of demeanor when the false statements were presented to him. It was not until the appellant heard excerpts from his mother's tape-recorded statement and was told by Francis that she had implicated him in his father's murder that he revealed that he had been present when Ulrich killed Lincoln, Sr.

Other than the use of the police-fabricated statements, there was nothing out of the ordinary and certainly nothing coercive about the circumstances surrounding the interrogation. The appellant was 26 years old and a high school graduate. He had been advised of his *Miranda* rights, initialed each of the rights on the "Explanation of Rights" form, and signed his name stating that he understood all his rights. Further, during his taped statement the appellant said he was speaking freely and voluntarily and had not been made any promises or coerced. The appellant was not under the influence of any substance. No threats or promises were made. The appellant was not denied use of the bathroom or food or drink or medicine. The appellant was not a newcomer to the criminal justice system. The entire interview lasted only an hour and a half. It was conducted in the middle of the afternoon. Only two officers were present.

Upon our independent review, under the totality of the circumstances test of the voluntariness of the appellant's inculpatory statements, we conclude that the use of the police-fabricated "statements" against him did not overcome his will. Accordingly, the hearing court did not err in denying the appellant's motion to suppress the statements from evidence.

Paper No. 15, Ex. 11 at 29-31.

The court finds the Court of Special Appeals determination to be a reasonable application of law and it shall not be overturned. *Miranda v. Arizona*, 384 U.S. 436 (1966), forbids coercion, not mere strategic deception by taking advantage of suspect's misplaced trust. The compulsion proscribed by *Miranda* includes deception by the police. *See Miranda, supra,* 384 U.S. at 453 (indicting police tactics "to induce a confession out of trickery," such as using fictitious witnesses or false accusations); *Barkier v. McCarty,* 468 U.S. 420, 433 (1984) ("The purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce *or* trick captive suspects into confessing") (emphasis deleted and added). Cf. *Moran v. Turbine,* 475 U.S. 412, 421  (1986) ("[T]he relinquishment of the right [protected by the *Miranda* warnings] must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"). Ploys to mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns. *See Oregon v. Matheson*, 429 U.S. 492, 495-496 (1977). The fact, however, that the police lie to a suspect to elicit his confession does not necessarily render it involuntary. *See Green v. Scully*, 859 F.2d 894 (2[d] Cir. 1988) . Police trickery must be evaluated under the totality of circumstances test, which requires a court to consider (1) the characteristics of the accused, (2) the conditions and setting of the interrogation, and (3) the details of the interrogation. *See United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987).

Plainly, the Court of Special Appeals' correctly analyzed the totality of circumstances surrounding the time and place of Petitioner's interrogation by Baltimore City Police Detectives. The ruse involving the three photographs made by Detective Francis did not prompt Petitioner's confession.  He remained steadfastly firm that he had no involvement in his father's death after being shown the photographs with the deceptive handwritten comments.   It was only after hearing the taped statement of his mother that he inculpated himself.   The appellate court decision shall not be overturned.

### D.  Post-conviction Court Error

Insofar as Petitioner may be seeking habeas corpus relief with regard to Judge Holland's post-conviction findings, such claims implicate the issue of this court's subject matter jurisdiction under 28 U.S.C. § 2254.   Errors or defects in state post-conviction proceedings do not raise constitutional questions cognizable in federal habeas corpus proceedings.  *See Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988); *see also Williams-Bey v. Trickey,* 894 F.2d 314, 317 (8th Cir. 1990); *Kenley v. Bowersox*, 228 F.3d 934, 938-39 (8th Cir. 2000); *Zamora v. Pierson*, 158 F.Supp.2d 830, 836 (N.D.  Ill. 2001).

### <u>Conclusion</u>

The court finds no basis to grant Petitioner habeas relief in light of its examination of trial and post-conviction transcripts and state court rulings.  His Petition shall be denied and dismissed.

When a district court dismisses a habeas petition, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  A prisoner satisfies this standard by demonstrating that reasonable jurists would find that his constitutional claims are debatable and that any dispositive procedural rulings by

the district court are also debatable or wrong. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003);

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001).

Petitioner does not satisfy this standard, and the court declines to issue a certificate of appealability.

A separate order shall be entered reflecting the foregoing Memorandum Opinion.

Date:  <u>January 22, 2010</u>                      _____/s/_____
                                                   DEBORAH K. CHASANOW
                                                   United States District Judge